# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-4334

_____

| | | |
|---|---|---|
| Technical Ordnance, Inc.; | * | |
| Norman H. Hoffman, | * | |
| | * | |
| Plaintiffs - Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| United States of America; | * | Appeal from the United States |
| Douglas Moore, Special Agent, | * | District Court for the |
| The Bureau of Alcohol, Tobacco, and | * | District of South Dakota. |
| Firearms ("ATF"), U.S. Department of | * | |
| the Treasury; Other Unknown ATF | * | |
| Agents John Doe 1, John Doe 2, | * | |
| John Doe 3, John Doe 4, | * | |
| John Doe 5, True Names Unknown, | * | |
| | * | |
| Defendants - Appellants. | * | |

_____

Submitted: December 13, 2000
Filed: March 26, 2001

_____

Before McMILLIAN, FAGG, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

After a jury found Technical Ordnance, Inc. (Ordnance) and Norman Hoffman, the president of Ordnance, not guilty of criminal charges growing out of their business

of manufacturing and selling explosive materials, they sued the United States and several agents of the Bureau of Alcohol, Tobacco, and Firearms (ATF). Special Agent Douglas Moore was the only identified individual defendant. The district court denied Moore's motion for summary judgment on the basis of qualified immunity, and he appeals. We reverse.

I.

Ordnance is a manufacturer and distributor of explosive devices. It exports products abroad in two different ways. The first is by export to foreign countries or foreign companies. The second is pursuant to Department of Defense (DOD) contracts. On March 20, 1992, Moore and Kim Kratochvil, an ATF regulatory compliance inspector, went to the Ordnance facility at Clear Lake, South Dakota to investigate three accidental explosions that had occurred there between January 16 and January 21, 1992. They also wished to inspect explosive bunkers and inventory for which Ordnance had received a non-compliance citation two years earlier. ATF has jurisdiction to license and regulate the importation, manufacture, distribution, and storage of explosive materials in interstate and foreign commerce. See 18 U.S.C. §§ 842 and 843. Those who operate under an ATF license must keep records and make those records and their storage facilities available for inspection. See id. at §§ 842(f) and 843(f). Ordnance has had an ATF license since 1989.

Prior to the inspection in March 1992, Hoffman had had a longstanding disagreement with ATF about its jurisdiction over Ordnance. He had told ATF agents on several occasions that his business was over regulated and that ATF should not have jurisdiction over its activities. He also disagreed with ATF concerning the scope of its regulation.

Congress has provided that companies cannot lawfully engage in the sale of defense articles directly to foreign entities without a license from ATF and an export

license from the State Department.  See id. at § 842 (a); 22 U.S.C. § 2778(g)(6).  ATF describes sales to foreign entities under these licenses as "commercial sales," and it has regulatory jurisdiction over this type of sale.  See 18 U.S.C. § 843.  ATF does not have authority, however, to regulate sales to foreign governments when they are made under contracts with the United States military, see id. at § 845(a)(6), and it describes such sales as "government to government sales."  Until 1989 Ordnance had exported materials to foreign governments and related foreign businesses without an ATF license.  Ordnance used its own terminology for those sales; it called them "foreign military sales" and denied that they were "commercial sales" subject to ATF regulation.  In 1988 ATF informed Ordnance that these sales were "commercial" and fell within its jurisdiction, and Ordnance obtained an ATF license in 1989.

When Moore and Kratochvil went to the Clear Lake facility on March 20, 1992, they met with Hoffman and John Yuhas, the vice president of Ordnance.  Hoffman objected to the inspection; he said ATF did not have jurisdiction over the Clear Lake plant.  Hoffman stated that Ordnance was not "currently" engaged in what he called "foreign military sales" and was "currently" working only under DOD contracts so ATF did not have jurisdiction over the operations.  Hoffman showed Moore a computer printout listing the work being done at the Clear Lake facility on that day, indicating that all of it was under DOD contract.  Hoffman told the agents that records of all DOD contracts and foreign military sales were kept at the Ordnance facility in St. Bonifacius, Minnesota.

Appellees claim that Hoffman told Moore that Ordnance still did foreign military sales but that the only work that day was under DOD contract.  Moore says that he asked Hoffman why Ordnance had an ATF license if it only engaged in DOD contracts, and Hoffman replied "because they made me get one."  Appellees say they felt threatened during this conversation because Moore asked Hoffman and Yuhas if they realized he wore a badge, carried a gun, and could arrest people.  Eventually Hoffman discussed the causes of the explosions with the agents and allowed Kratochvil to

inspect the facility, and Kratochvil determined that Ordnance had remedied the problem for which it had been cited two years previously.

Moore suspected that Ordnance was engaged in direct export to foreign governments and that Hoffman had lied when he told him that Ordnance was currently working only on projects under DOD contracts. He continued his investigation of Ordnance after the inspection on March 20. During his investigation, Moore received reports from defense contract investigators which indicated that relatively few Ordnance projects were under DOD contract. He also received a printout from the State Department indicating that, beginning in 1983 and as late as June 3, 1992, Ordnance had been making sales directly to foreign governments or companies under export licenses issued by the State Department, rather than under military contract. Such sales do not fall under the 18 U.S.C. § 845 (a)(6) exemption from ATF regulatory jurisdiction (the exemption for so-called government to government sales).

On October 19, 1992, Moore applied for a warrant to search the Clear Lake facility. His accompanying affidavit was also used by another ATF agent who attached it to his own affidavit and application for a search warrant for the St. Bonifacius facility in Minnesota where company records were located. Moore testified in his affidavit that Hoffman had told the ATF agents during the March 20, 1992 inspection that:

> because his operation currently involves only Department of Defense contracts, [] ATF has no jurisdiction and his companies [sic] activities are exempted under Title 27, CFR, Section 55.141. Hoffman stated that his company has discontinued manufacturing destructive devices and is not currently providing explosive materials to foreign customers or governments.

Appellees' Appendix at 372-73. Moore also included in his affidavit information that he had uncovered showing that Ordnance had been making sales directly to foreign governments from January 19, 1983 through June 3, 1992. He attached the State

Department computer printout in support. He also supplied two other documents: an ATF report from April 17, 1990, indicating that Hoffman had told an agent that all projects at Clear Lake were under DOD contract, and a July 25, 1990 letter from John Yuhas to ATF saying that all Clear Lake projects at that time were conducted under government contracts. This evidence led Moore to believe that Hoffman had made false statements when he claimed an exemption for work being done at the Clear Lake facility and Moore concluded in his affidavit that "either no records are being maintained for the commercial transactions, . . . , or false records are being maintained to conceal the activity and give the appearance that the transactions are exempted under government contract obligations." Id. at 378.

The applications and Moore's affidavit were presented to two different United States magistrate judges who each found probable cause and who issued search warrants for both the Clear Lake, South Dakota and St. Bonifacius, Minnesota facilities. The warrants were executed simultaneously at both locations by ATF and DOD agents who seized a number of documents. Appellees complain that the agents only seized documents that were incriminating and bypassed or refused exculpatory documents offered by Ordnance employees.

Moore prepared a criminal case report, based in part on the seized documents. In his case report Moore listed all Ordnance commercial transactions from 1983 to 1992, the corresponding records ATF had seized under the search warrants, and an analysis of whether the records complied with ATF regulations. He forwarded the report to federal prosecutors who decided after reviewing it to seek an indictment against Ordnance and Hoffman. A federal grand jury was convened, and Moore was called to testify. He testified that during the March 20, 1992 inspection, Hoffman had "related at that point in time, they were not engaged in any commercial activity, nor were they at a given point in time engaged in any contract with foreign sales." Appellant's Brief at 10. In September 1993, the grand jury returned a multi-count indictment charging Ordnance and Hoffman with federal offenses related to licensing

and record requirements, false statements, and conspiracy.[1]

After Ordnance and Hoffman were acquitted in a jury trial, they brought this action against the United States under the Federal Tort Claims Act (FTCA), see 28 U.S.C. §§ 1346, 2671 et seq.,[2] and against Moore and other unnamed ATF agents under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). In their 43 page complaint appellees raised many claims, including violations of their First, Fourth, and Fifth Amendment rights, conspiracy involving Moore and unnamed agents, negligent training and supervision, abuse of process, malicious prosecution, and infliction of emotional distress. They sought some $60,020,000 in damages from Moore and other unidentified ATF agents, $54,000,000 in damages from the United States, punitive damages, an injunction prohibiting the defendants from harassing, threatening, or otherwise attempting to intrude upon their constitutional rights, and attorney fees and costs.

The defendants moved to dismiss the action for failure to state a claim and Moore moved to dismiss the claims against him on the basis of qualified immunity. The district court dismissed the following claims: Fifth Amendment, abuse of process, and conspiracy by Moore. It denied dismissal for the claims of malicious prosecution

---

[1]The indictment included charges of manufacturing and dealing explosive materials without an ATF license in violation of 18 U.S.C.§ 842(a)(1) (for the period before 1989 when Ordnance engaged in direct foreign sales without an ATF license), unlawful commercial distribution of explosive materials to unauthorized persons in violation of 18 U.S.C. § 842 (b), unlawful manufacture, purchase, distribution, and receipt of explosive materials without making required records in violation of 18 U.S.C. § 842(f), false statements in violation of 18 U.S.C. § 1001, and conspiracy in violation of 18 U.S.C. § 371.

[2]Under the FTCA the United States may be held liable for a tort committed by an employee acting within the scope of his office, see 28 U.S.C. § 1346(b), and such a claim is tried to the court. See id. at § 2402.

and intentional infliction of emotional distress, and it denied Moore's motion for qualified immunity except on a claim that he had illegally expanded the scope of the search. The district court stated that Moore was not entitled to qualified immunity on the Fourth Amendment claim arising out of his warrant affidavit because "[a] reasonable officer would have known there was no probability or even possibility of criminal activity." (9/30/98 Order at 13). Discovery proceeded and after it was completed, Moore renewed his motion for summary judgment on the basis of qualified immunity. The motion was again denied. The district court believed there was "a genuine issue for trial" on the question of "whether or not it was objectively reasonable to assume that either no records or inadequate records existed." (10/28/99 Order at 4). The court also concluded that Moore was not entitled to qualified immunity on the First Amendment and malicious prosecution claims.

## II.

To defeat a government official's claim of qualified immunity, a plaintiff must demonstrate that the official's actions violated a statutory or constitutional right, that the right was clearly established at the time of the violation, and that a reasonable official would have known that his conduct violated that right. See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Sexton v. Martin, 210 F.3d 905, 909-910 (8th Cir. 2000). Qualified immunity issues should be resolved as early as possible because one of the purposes of qualified immunity is to protect public officials from disruptive "broad-ranging discovery." See Anderson v. Creighton, 483 U.S. 635, 646-47 n.6 (1987) (quoting Harlow, 457 U.S. at 817). In some circumstances limited discovery may be required to resolve the qualified immunity question. See id. A public official is entitled to summary judgment in the absence of any genuine issue of material fact. See Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). In this case full discovery was permitted before the court ruled on Moore's renewed motion for summary judgment. Although appellees contend that there are genuine issues of fact that must be decided by a jury, they have not identified any *material* issues of fact preventing summary

-7-

judgment. The parties do draw conflicting legal conclusions from what was said and done, and we have jurisdiction to reach the issues of qualified immunity. See Behrens v. Pelletier, 516 U.S. 299, 312-13 (1996).

A.

Moore argues first that he is entitled to qualified immunity on the claim that he subjected appellees to an illegal search and seizure in violation of their Fourth Amendment rights. Appellees claim that the Fourth Amendment law is clear and that Moore violated it by misstatements and omissions in his warrant affidavit. They also attempt to raise a malicious prosecution claim based on the Fourth Amendment, saying that he violated clearly established law of which a reasonable officer would have known when he caused them to be prosecuted without probable cause. Moore denies that he violated any clearly established law under the Fourth Amendment.

1.

To meet the requirements of the Fourth Amendment, a search warrant must be issued by a neutral and detached magistrate on the basis of an affidavit that states probable cause for the search. See Johnson v. United States, 333 U.S. 10, 13-14 (1948). Probable cause exists if the affidavit gives a magistrate a "substantial basis for . . . conclud[ing] that a search would uncover evidence of wrongdoing." Illinois v. Gates, 462 U.S. 213, 236 (1983) (alterations in the original, quotation marks and citations omitted). It is not to be determined "according to a fixed and rigid formula, but rather in the light of the 'totality of the circumstances' made known to the magistrate," and a magistrate is allowed to draw reasonable inferences from the evidence presented. Massachusetts v. Upton, 466 U.S. 727, 728, 734 (1984) (per curiam).

A warrant issued on the basis of an affidavit that shows probable cause only

because it contains a deliberate or reckless falsehood or omission violates the Fourth Amendment.[3]  See Franks v. Delaware, 438 U.S. 154, 155-56 (1978); United States v. Humphreys, 982 F.2d 254, 258 n.2 (8th Cir. 1992).  Even if a false statement or omission is included in an affidavit, the Fourth Amendment is not violated if the affidavit would still show probable cause after such falsehood or omission is redacted or corrected.  See Franks, 438 U.S. at 171-72; Hunter v. Namanny, 219 F.3d 825, 829 (8th Cir. 2000).

The appellees claim that Moore omitted evidence he should have included, that he did not mention reports that showed that agents had examined Ordnance records twice in the past two years and concluded they complied with ATF regulations.  The reports appellees cite do not indicate that ATF performed a complete inspection of all Ordnance records or that ATF found that the records accurately reported all commercial sales as required by regulations.   The reports do show that Ordnance did not keep records of materials used in commercial sales separate from those for sales under government contract and that agents were therefore concerned about the difficulty of determining whether Ordnance was in compliance.[4]   See Appellee's

---

[3]The record does not indicate whether Ordnance and Hoffman ever requested a Franks hearing during the criminal proceedings against them or sought to suppress evidence obtained under the search warrants. In order to obtain a Franks hearing, a party must first "make a *substantial* preliminary showing of an intentional or reckless falsehood made in the affidavit."  See United States v. Wajda, 810 F.2d 754, 759 (8th Cir. 1987) (emphasis in original).  This requirement is not lightly met, see id., and is not satisfied by conclusory allegations that the affiant made reckless or intentional misstatements.  See Franks, 438 U.S. at 171.

[4]For example, in a report dated September 17, 1991, an ATF inspector stated:

TEK ORD maintains computerized records for all of their operations, including the receipt, manufacture and storage of all explosive materials . . . . When taken as a whole, TEK ORD's records contain all of the information required by Part 55, but the

-9-

Appendix at 571, 572, 630-32. Even if Moore's affidavit were amended to show the existence of these reports, it would still show probable cause. Any such omission was therefore not material.

Appellees claim there was a material omission in the affidavit because Hoffman had said Ordnance records were stored at St. Bonifacius and the affidavit did not mention that town or the fact that Moore had not traveled there to make an inspection. The affidavit could not have misled a reviewing magistrate to understand that all records were at the Clear Lake facility, however, because Moore stated in the affidavit that Hoffman had said that the records were kept in Minnesota (Moore referred to the Minnesota town as Waconia, a previous site for the records). See id. at 377. Even if the exact wording now proposed by appellees would have been added by Moore, there would still have been probable cause to search the Clear Lake facility.

Probable cause requires evidence of a nexus between the object sought and the place to be searched. See United States v. Tellez, 217 F.3d 547, 550 (8th Cir. 2000). During Moore's March inspection he had seen Hoffman print out a list of work being performed on that day at Clear Lake. He knew that at least some records must therefore be available at that location and through his investigation he obtained

---

licensee does not maintain records specifically for ATF and our inspectors encountered some difficulty in identifying and tracing those explosives which are subject to ATF regulation . . . . There is no segregation of explosives in storage based on intended use. Without the assistance of TEK ORD personnel the ATF Inspectors were unable to differentiate between explosives that will ultimately be used to fill DOD contracts (and therefore exempt from Part 55) and surplus explosives that will be used to fill FMS contracts. TEK ORD was therefore in the enviable position of dictating what materials, if any, are subject to ATF regulation.

Appellee's Appendix at 631.

-10-

evidence that suggested Hoffman had lied about what work was currently being done. Based on what he learned, Moore could have reasonably inferred that the St. Bonifacius records would not agree with those kept in Clear Lake or that Hoffman was lying about the location of the records, as well as about what they contained. He was not required to go to St. Bonifacius to examine the records before seeking a search warrant, for once an agent has established probable cause, he is not required to conduct a further investigation in the hope of finding exculpatory evidence. See Forman v. Richmond Police Dept., 104 F.3d 950, 962 (7th Cir. 1997). The omission of the correct name of the Minnesota records site and the fact that Moore had not himself reviewed those records was not material.

Appellees claim Moore set out Hoffman's statements in a manner designed to mislead a magistrate into believing that Hoffman had lied during the March 20 inspection. They claim that Hoffman told Moore that the company had no foreign contracts on the day of the inspection but that it engaged in both DOD contracts and foreign military sales. Moore never stated in his affidavit that Hoffman claimed that Ordnance only performed DOD contracts. The affidavit indicates that Moore understood Hoffman to say that Ordnance was not engaged in direct sales to foreign governments on that day. Appellees find it significant that on pages 2 and 3 of his affidavit Moore repeated Hoffman's statement that Ordnance was not "currently" making direct sales to foreign governments, but that he did not include that word in the summary section. See Motions Hearing Transcript 3/19/97 at 23. Counsel argued that this was misleading because the summary is "probably the only section that anyone read." Id. This argument is sheer speculation. The affidavit was only eight pages, and there is no evidence or reason to believe that either magistrate did not consider the whole affidavit, as required under the law. See United States v. Anderson, 933 F.2d 612, 614 (8th Cir. 1991) (warrant affidavits are to be read "as a whole"). The fact that the word "currently" was not repeated in the summary does not show an intentional or reckless omission. It would be a rare summary that included all that went before.

If the affidavit were amended with the language appellees suggest, to say that "Hoffman and Yuhas had acknowledged that Technical Ordnance engaged in 'foreign military sales' over which they disputed ATF's jurisdiction [and] that no work on such sales was in progress at the Clear Lake plant on March 20, 1992," Appellee's Brief at 53, the affidavit would still have contained probable cause that officers of the company had lied and were not keeping records required by ATF regulation. The affidavit would still have shown that Yuhas and Hoffman stated that on three particular days (April 17 and July 25, 1990 and March 20, 1992) the Clear Lake plant was working only on United States military projects and was exempt from ATF regulation when other information contradicted the assertions. Moore pointed out that defense contract investigators had told him that Ordnance had few DOD contracts around March 20, 1992, and documents from the State Department showed that the Clear Lake facility had contracts directly with foreign governments from January 19, 1983 through June 3, 1992, totaling over $11,000,000.

The affidavit contains other facts that would cause a reasonable law enforcement agent to be suspicious. Between January 16 and January 21, 1992, three explosions had occurred at the Clear Lake facility, but none were reported to ATF. When asked about them, Hoffman acknowledged they had occurred, but he claimed that he was not required to report them since only exempt DOD contracts were being worked on at that time. During the March 20 inspection, Hoffman initially denied ATF access to an explosives bunker because it was marked with a DOD sticker. Moore learned later from a defense contract investigator that Ordnance had not been working on any classified DOD projects on March 20. Another investigator informed Moore that "during her last compliance inspection . . . she found the company in total non-compliance, because she found the inventory and accountability so confusing she found it impossible to sort out the situation." Appellee's Appendix at 373-74.

The appellees attempt to parse Moore's affidavit, looking at individual parts in isolation. A warrant affidavit is properly viewed as a whole, and the reviewing

magistrate is to examine its totality. See Gates, 462 U.S. at 230-31; Anderson, 933 F.2d at 614 ("the affidavit cannot be attacked paragraph by paragraph; it must be evaluated as a whole"). It "should be read with common sense and not in a grudging, hyper technical fashion." Walden v. Carmack, 156 F.3d 861, 870 (8th Cir. 1998). A law enforcement official is not required to include everything he knows about a subject in his affidavit, whether it is material to a finding of probable cause or not. See United States v. Ramirez, 279 F.2d 712, 716 (2d Cir. 1960). The warrant contained evidence that Ordnance claimed exemptions on six nonconsecutive days during a time period in which it was engaged in a significant number of direct foreign sales which are under ATF jurisdiction. Investigators had found Ordnance's recordkeeping confusing and non-compliant, and in at least one instance an Ordnance officer lied to agents when he claimed that a bunker contained classified DOD materials.

ATF is granted broad authority to enter the premises of a regulated explosives manufacturer to inspect its records and storage facilities. Its jurisdiction did not hinge on whether Ordnance was performing foreign military sales on the day of the inspection. See 18 U.S.C. § 843(f) ("The Secretary may enter during business hours the premises . . . of any licensee or permittee, for the purpose of inspecting or examining (1) any records or documents required to be kept by such licensee or permittee, . . . and (2) any explosive materials kept or stored by such licensee or permittee at such premises."); see also 27 C.F.R. § 55.24. Given all the evidence in the affidavit, it was not unreasonable for Moore to infer that Hoffman had lied in claiming exemptions on days ATF was investigating.

Appellees have not shown any genuine issue of material fact as to whether Moore intentionally or recklessly made misstatements or omissions in his affidavit. Imprecision in the affidavit may show that Moore was careless in drafting some of the language, but careless error does not show reckless or intentional misconduct. Neither does the fact that Moore may have used somewhat different language in recounting

Hoffman's statements in his grand jury testimony than in his affidavit.[5]  The Fourth Amendment requires that a warrant affidavit be a "truthful factual showing of probable cause -- truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." Mueller v. Tinkham, 162 F.3d 999, 1003 (8th Cir. 1998) (quotation marks and citations omitted).  Moore did not attempt to search Ordnance facilities without a warrant, nor did he rush to apply for a warrant.  He began an investigation when his suspicions were aroused as a result of the March 20 Clear Lake visit.  After some seven months, he applied for a warrant and summarized in his affidavit what he had learned from speaking to a number of agents and from gathering records.  Appellees have not shown that Moore did not believe what he put in the affidavit or that probable cause only existed because of intentional or reckless falsehoods or omissions in his affidavit.  Moore is entitled to qualified immunity on this claim.

2.

Moore asserts that he is also entitled to qualified immunity on the malicious prosecution claim because appellees have not alleged that he infringed a constitutional right.  The general rule is that an action for malicious prosecution does not state a claim of constitutional injury. See Pace v. City of Des Moines, 201 F.3d 1050, 1055 (8th Cir. 2000).  Appellees may overcome Moore's assertion of qualified immunity only if they

---

[5]Appellees argue that there is a material question of fact about whether Hoffman told the agents that Ordnance was not "currently" engaged in direct foreign sales, as Moore stated in his affidavit, or whether Hoffman used the phrase "at that time," as Moore testified to the grand jury.  To defeat summary judgment, appellees must show there is a genuine dispute over facts that could affect the outcome of the lawsuit. See Webb v. Lawrence County, 144 F.3d 1131, 1135 (8th Cir. 1998).  The word "currently" has essentially the same meaning as the phrase "at that time." See WEBSTER'S NEW WORLD DICTIONARY OF AMERICAN ENGLISH 340 (3d ed. 1988) (defining "current," in part, as "at the present time").

show that the acts on which they base their malicious prosecution claim also violate a constitutional provision or federal law.  See Sanders v. Sears, Roebuck & Co., 984 F.2d 972,  977 (8th Cir. 1993).

The district court concluded that appellees' malicious prosecution claim alleged a violation of a clearly established constitutional right under the Fourth Amendment.[6] Appellees allege that they were forced to post bond, summoned to appear before court, and made to answer charges although prosecuted without probable cause.  They contend that such malicious prosecution amounted to an illegal seizure under the Fourth Amendment, citing Albright v. Oliver, 510 U.S. 266, 276-81 (1994).[7]  In that case, Albright had brought a substantive due process claim charging malicious prosecution by the detective who had initiated criminal proceedings against him.  The Court held that Albright had not stated a claim, but suggested that he might have been able to raise a claim of improper arrest under the Fourth Amendment.  See id. at 274-75 (plurality opinion); id. at 281 (Kennedy, J.,concurring); id. at 288-89 (Souter, J., concurring in the judgment).  Justice Ginsburg suggested in dictum in her concurrence that pretrial deprivations of liberty, such as the requirement to post bond, to attend court proceedings, and limitations on travel might amount to a seizure, implicating the Fourth

---

[6]The district court dismissed appellees' attempt to raise their malicious prosecution claim under the Fifth Amendment, stating "a claim for malicious prosecution, if it exists, must fall under the Fourth Amendment . . . . Plaintiff's Fifth Amendment claims must fail . . . . Plaintiffs' Fifth Amendments . . . claims against defendants Moore and the United States are dismissed." (4/14/97 Order at 10, 13). The appellees have not now attempted to appeal that ruling.  Although they cite a list of procedural due process cases, they have not pointed to specific authority which shows the district court erred.

[7]They also rely on Gerstein v. Pugh, 420 U.S. 103, 111 (1975), which held that an arrestee may be subjected to extended detention only after a judicial determination of probable cause.  Appellees were never jailed, and Gerstein does not support their Fourth Amendment theory in this case.

-15-

Amendment. See id. at 276-81. The two dissenting Justices seemed to agree. See id. at 307 (Stevens, J. and Blackmun, J., dissenting).

This circuit has never held that pretrial restrictions such as those alleged by appellees constitute a Fourth Amendment seizure. Appellees argue that the Third Circuit recognized this theory in Gallo v. City of Philadelphia, 161 F.3d 217 (3d Cir. 1998). They also cite to dicta in Murphy v. Lynn, 118 F.3d 938 (2nd Cir. 1997), cert. denied, 522 U.S. 1115 (1998) (obligation to appear in court and curtailment of travel could constitute a seizure). But see Britton v. Maloney, 196 F.3d 24, 28-30 (1st Cir. 1999), cert. denied, 120 S.Ct. 2198 (2000). We cannot say that the Albright dictum amounts to a statement of clearly established law. Moreover, since Moore's conduct took place prior to the 1994 decision in Albright, it could not have violated any clearly established constitutional right. Moore is entitled to qualified immunity on this claim.

B.

Moore argues that he is also entitled to qualified immunity on the claim that he violated appellees' First Amendment rights by initiating criminal proceedings against them. Appellees claim his actions were in retaliation for their belief that ATF should not have jurisdiction over their business. The district court denied qualified immunity to Moore on this claim with the comment that "defendants' actions had effectively silenced plaintiffs, depriving them of their right to freedom of speech and expression." (4/14/97 Order at 11).

Prosecution in retaliation for the exercise of the right to protest government policy is an impermissible intrusion upon First Amendment rights, United States v. Catlett, 584 F.2d 864, 867 (8th Cir. 1978), but appellees cannot proceed without a showing that Moore acted with an improper motive when he took steps that led to the prosecution against them. See Crawford-El v. Britton, 523 U.S. 574, 600 (1998). Moore asserts that appellees have not made such a showing.

-16-

To overcome Moore's defense of qualified immunity, appellees must show that a material fact or question of law precludes summary judgment. See Yellow Horse v. Pennington County, 225 F.3d 923, 927 (8th Cir. 2000). Because Moore's motive is at issue, "the plaintiff[s] may not respond simply with general attacks upon [Moore's] credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff[s have] carried [their] burden of proving the pertinent motive." Crawford-El, 523 U.S. at 600. Appellees allege that during the March 20, 1992 inspection, Moore told Hoffman and Yuhas that he wore a badge, carried a gun, and could arrest people; that Ordnance received a threatening phone call from an unidentified man after service of the complaint saying "be real careful of what you ship"; that Moore believed that Hoffman would object publicly to the ATF searches; that the searches were simultaneous, unannounced, and involved 21 federal agents; and that only documents that made it appear that Ordnance was involved in improper activities were seized. Even taking all of appellees' allegations as true, and drawing all reasonable inferences in the light most favorable to them, they do not show that Moore was motivated by animus against them for their positions on governmental regulation. We do not question that appellees themselves hold a sincere belief that ATF targeted them because of their opinion that they should be free of its regulation, but they have not made the requisite showing that Moore's conduct was the result of an improper motive or in retaliation for their beliefs in violation of the First Amendment. Moore is entitled to qualified immunity on this claim.

III.

After considering the full record and the arguments the parties raise on all of the various theories asserted in the Bivens action against Moore, we conclude that appellees have not made a showing that Moore violated any clearly established constitutional right and that as a matter of law he is entitled to qualified immunity. The order denying Moore's motion for summary judgment is reversed, and the case is remanded for resolution of the remaining claims against the United States.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.